**UNITED STATES of America, Appellee,**

v.

**James D'AGOSTINO, and Anne Marie D'Agostino, Defendants–Appellants.**

**Nos. 1004, 1007, Dockets 97–1336, 97–1337.**

United States Court of Appeals, Second Circuit.

Argued Feb. 10, 1998.

Decided April 30, 1998.

Bernard S. Mark, Kestenbaum & Mark, Great Neck, NY, Paula Schwartz Frome, of counsel, Kase & Druker, Garden City, NY (James O. Druker, Kase & Druker, Garden City, NY, on brief), for Defendants–Appellants.

Leonard Lato, Assistant U.S. Attorney, Brooklyn, NY (Zachary W. Carter, U.S. Attorney for Eastern District of New York, Peter A. Norling, Assistant U.S. Attorney, Brooklyn, NY, on brief), for Appellee.

Before: JACOBS, VAN GRAAFEILAND, and LAY,* Circuit Judges.

LAY, Circuit Judge.

James and Anne Marie D'Agostino appeal from a final judgment of the United States District Court for the Eastern District of New York (Seybert, J.) convicting them of

one count of conspiracy to defraud the United States and tax evasion under 18 U.S.C. § 371 and 3551 as well as four counts of attempted tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. §§ 2 and 3551. The basic question on appeal is whether the defendants can be guilty of tax evasion by diverting monies from their solely owned corporation where the corporation had no earnings or profits in the years in question. We hold under Second Circuit precedent they cannot. We reverse the judgments of conviction.

## FACTS

Between 1989 and 1992, James D'Agostino owned two corporations, Koin Key Investors ("Koin Key") and D'Ag Laundry. The two corporations in turn owned commercial laundromats as well as commercial and residential real estate in Westbury, New York. James's wife, Anne Marie D'Agostino, worked for both corporations and had primary responsibility for the corporate bookkeeping and banking.

Three present and former bank tellers testified that Anne Marie made weekly deposits of cash into corporate and personal bank accounts at the National Westminster bank. At the same time, Anne Marie had the teller exchange certain small bills for larger bills. One teller estimated that Anne Marie exchanged between $2,000 to $4,000 a week. Anne Marie then took the large bills home with her and kept them in her kitchen drawer. The government estimated she diverted approximately $400,000 of corporate funds in this manner between 1989 and 1993. The D'Agostinos did not report these funds on their personal income tax returns. After an extensive investigation, the government indicted the D'Agostinos of one count of conspiracy to defraud the United States and four counts of attempted tax evasion.

According to the testimony of the D'Agostinos' accountants, the D'Agostinos had lent money to Koin Key, the primary corporation at issue in this case,[1] creating an opening

---

* Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. It is unclear from the record which corporation, Koin Key or D'Ag Laundry, owned the laundromats and other commercial properties

from which Anne Marie D'Agostino collected the money. However, both the government and the D'Agostinos treat the diverted funds as Koin Key's corporate income.

loan account in the amount of $668,451. The loan account was reduced to $558,132 by 1992 as a result of payments the corporation made to the D'Agostinos for boat and home expenses. The D'Agostinos also had a capital account with Koin Key in the amount of $282,000 from 1989 to 1992. The accountants also testified, and the government apparently concedes, that Koin Key had no earnings and profits during the tax years of 1989 through 1992.

At trial, the D'Agostinos contended they did not owe any tax on the approximately $400,000 of diverted corporate funds. The income Anne Marie diverted, they argued, was corporate income received by a shareholder, which is taxable if it is a constructive dividend payment, but is not taxable if it is a reduction in the shareholder's loan account or capital account. They pointed out that if a corporation has no earnings and profits, then it cannot pay any dividends, and the money received by the shareholder must constitute a reduction in the loan account or capital account. Therefore, the D'Agostinos argued, the diverted funds constituted a nontaxable reduction of the shareholder loan account. If the diverted income is not taxable, there is no tax deficiency in this case.

The government presented a different theory of tax liability at trial. The government contended that whether the diverted funds constitute personal income or corporate income depends upon the intent of the taxpayer at the time the funds are diverted. If the intent is to evade taxes, the income is personal and taxable. If the intent is to take a reduction under the loan account or capital account, then the funds are not taxable. In this case, the government argued, the D'Agostinos intended to evade paying taxes when Anne Marie exchanged and hid the diverted funds. Therefore, the diverted funds were personal income subject to taxation, and a tax deficiency exists.

The district court adopted the government's theory of the case and gave the following charge to the jury:

> If you find beyond a reasonable doubt that the D'Agostinos diverted fund[s] of the corporation to themselves personally, and exercised dominion over the diverted monies and treated the monies as their own, and at that time they did not intend the funds to be a return of a loan or a return of capital, that would constitute taxable income that they were required by law to include in their income tax returns. (Tl. Tr. at p. 1154).

The jury found the D'Agostinos guilty of each count of the indictment. The district court sentenced James to sixteen months in prison and Anne Marie to six months of home detention and five years of probation.

## THE APPEAL

The D'Agostinos raise five issues on appeal: (1) whether there was sufficient evidence to support their convictions for tax evasion where the government failed to prove the statutorily required existence of a tax deficiency; (2) whether the district court unfairly marshaled the evidence in favor of the government and gave a charge to the jury that directed a guilty verdict; (3) whether the D'Agostinos were prejudiced by the government's change of theory and methods of proof during the trial; (4) whether the district court erred by admitting evidence of the D'Agostinos' lifestyle in a specific items case;[2] and (5) whether the district court erred by denying James D'Agostino's request for a two-level reduction under the Sentencing Guidelines for acceptance of responsibility.

**2.** At trial, the government purported to use a "specific items" method of proof, which sought to produce evidence showing the D'Agostinos had failed to pay taxes on specific items of income. However, the government also introduced evidence depicting the D'Agostinos' lavish lifestyle, such as photographs of their house, boat and residential and commercial properties. The D'Agostinos contend such evidence was relevant only in a "net worth" method of proof, which could not be used in this case because the government failed to establish a valuation of the D'Agostinos' initial income and worth. On appeal, the D'Agostinos charge the government unjustly "mixed and matched" theories of proof and the district court erroneously admitted "lifestyle" evidence. We need not reach the merits of these arguments, however, because the convictions are reversed on other grounds.

## DISCUSSION

The D'Agostinos contend there was insufficient evidence to support their conviction of criminal tax evasion. Under 26 U.S.C. § 7201, the government must prove beyond a reasonable doubt: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting evasion or attempted evasion of tax. *United States v. DiPetto,* 936 F.2d 96, 97 (2d Cir.1991) (*citing Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965)). At issue in this case is whether the government met its burden of proving the existence of a tax deficiency owed by the D'Agostinos personally.

In this Circuit, corporate funds lawfully diverted by a shareholder constitute taxable income only to the extent that the corporation had earnings and profits during the tax year in which the diversion occurred. *DiZenzo v. Commissioner,* 348 F.2d 122, 125 (2d Cir.1965) (Lumbard, C.J.) (holding that in a civil tax evasion case, the Tax Court erred in treating diverted corporate funds as ordinary, taxable income without considering whether the corporation had earnings and profits equal to the amount of the diverted funds); *United States v. Leonard,* 524 F.2d 1076, 1083 (2d Cir.1975) (Friendly, J.) (recognizing that in a criminal tax case, the defendant could be taxed on diverted funds only if the corporation had earnings and profits). This "no earnings and profits, no income" rule has also been adopted by the Tax Court. *See Truesdell v. Commissioner,* 89 T.C. 1280, 1294–95, 1987 WL 258105 (1987) (holding diverted corporate funds are taxable only to the extent of earnings and profits), *Action on Decision,* CC–1988–025 (Sept. 12, 1988). Following the *Truesdell* decision, the IRS changed its policy to reflect the "no earnings and profits, no income" approach. In 1988, the Tax Litigation Division of the Internal Revenue Service issued an Action on Decision that stated:

Funds diverted to the shareholder of a wholly owned corporation should be regarded as constructive distributions, unless the funds were additional salary or otherwise were received in a nonshareholder capacity. The funds should be included in the income of the corporation and taxed to the shareholder in accordance with I.R.C. [§ ] 301(c). *When such funds are received in a shareholder capacity, we will no longer argue they are ordinary income regardless of earnings and profits.* (emphasis added).

Action on Decision, CC–1988–025, 1988 AOD Lexis 22.

Under the "no earnings and profits, no income" rule, diverted corporate funds are treated as a constructive dividend to the shareholder to the extent the corporation had earnings and profits. To the extent that a corporation's distribution to a shareholder is *not* made out of earnings and profits, I.R.C. § 301(c)(2) treats the distribution as a return of capital to the shareholder that is applied against and made in reduction of the adjusted basis of the shareholder's stock; or, if applicable, the distribution is treated as a return of a loan.

In this case, Koin Key did not have any earnings and profits during the years Anne Marie diverted the corporate funds. During those same years, Koin Key owed the D'Agostinos approximately $558,000 for repayment of a loan and $282,000 for invested capital. These amounts owed to the D'Agostinos exceed the approximately $400,-000 the D'Agostinos diverted from the corporation. In effect, the corporation owed the diverted funds to the D'Agostinos. Therefore, under *DiZenzo,* the diverted funds could not constitute taxable income.

The government urges this Court to disregard the "no earnings and profits, no income" rule established in *DiZenzo* and adopt the approach taken in *United States v. Williams,* 875 F.2d 846 (11th Cir.1989). In *Williams,* the Eleventh Circuit held that, in criminal tax evasion cases, the government is not required to characterize diverted income and therefore need not prove that diverted funds constitute a constructive dividend or that the corporation had any earnings and profits. *Id.* at 851–52. Instead, the government need only show the taxpayer had actual command over the funds. *Id.* at 850 (quoting *Davis v. United States,* 226 F.2d 331, 335–36 (6th Cir.1955), *cert. denied,* 350 U.S. 965, 76

S.Ct. 432, 100 L.Ed. 838 (1956)).[3]  We decline to adopt this approach.

We agree the issue is close.  The government's burden on the tax deficit element may be difficult to satisfy in corporate fund diversion cases.[4]  However, the binding precedent of Second Circuit cases does not allow us as a panel to adopt the rule in *Williams*.

Furthermore, we believe the rule of this Circuit is better reasoned.  The *Williams* rule purports to minimize the government's burden of proving a tax deficit and places greater emphasis on the intent element in criminal tax evasion cases.  The apparent result, however, is that the government bears a higher burden of proof in a civil tax collection matter than in a criminal tax evasion prosecution.  In addition, the approach taken in *Williams* and *Davis* effectively eliminates proof of a tax deficiency as an element of a 26 U.S.C. § 7201 violation.  Under the *Williams* rule, the government would only need to prove that the taxpayer wilfully intended to exercise domain and control over the diverted funds and took affirmative acts to evade paying taxes.  If Congress intended this showing to suffice to establish a violation of § 7201, it would not have included a tax deficit as a requisite element.

  We have little doubt the D'Agostinos acted with bad intentions.[5]  Anne Marie hid, in total, $400,000 in large bills in her kitchen drawers and failed to reflect the diverted corporate funds in Koin Key's corporate books.  It is entirely possible the D'Agostinos intended to evade paying taxes on the diverted funds.  However, bad intentions, alone, are not punishable.  The diversion of the funds cannot constitute a criminal offense, despite criminal intent, if no taxes are due.  We also note that the "no earnings and profits, no income" rule would not necessarily apply in a case of *unlawful* diversion, such as embezzlement, theft, a violation of corporate law, or an attempt to defraud third party creditors.  *DiZenzo*, 348 F.2d at 125 ("We are not here dealing with sums stolen or embezzled by a taxpayer.  There has been no suggestion that the diversions in this case were improper as a matter of corporate law...."); *Truesdell*, 89 T.C. at 1298 ("In this case petitioner's diversions of income ... were not per se unlawful.  The diverted funds were not, at least on their face, stolen, embezzled or diverted in fraud of creditors.").  In this case, however, the government did not allege or prove that the D'Agostinos' diversions of corporate funds were unlawful.

Because the D'Agostinos did not owe any tax on the diverted funds, it is legally impossible for any rational juror to conclude a personal tax deficiency existed.  We therefore conclude, under Second Circuit precedent, there is insufficient evidence to support the convictions.[6]  This determination renders the remaining arguments presented by the D'Agostinos moot.

### CONCLUSION

For the reasons stated above, the judgment of conviction and sentence imposed by the district court are reversed and the case is remanded with directions to vacate the judgments of conviction and dismiss the indictments rendered against both defendants.

---

**3.** In *DiZenzo*, we implicitly rejected the reasoning of the *Davis* court.  348 F.2d at 126.

**4.** *See* Linda S. Eads, *From Capone to Boesky: Tax Evasion, Insider Trading, and Problems of Proof*, 79 Calif.L.Rev. 1421, 1452 (1991).

**5.** For instance, in 1992, James D'Agostino hired Jeffrey Pearlman to prepare fraudulent tax returns reflecting an inflated income to submit to a bank in order to procure a loan.

**6.** The D'Agostinos also challenge the sufficiency of the evidence supporting their conviction on the one count of defrauding the United States, in violation of 18 U.S.C. § 371 (a *Klein* conspiracy).  If the D'Agostinos did not owe taxes on the diverted corporate income, then they cannot be guilty of defrauding the government by not reporting the funds on their personal tax returns.  Thus, we also find there is insufficient evidence to support the D'Agostinos' conviction of defrauding the United States under 18 U.S.C. § 371.